COMMONWEALTH EDISON COMPANY, Petitioner, v. ILLINOIS COMMERCE COMMISSION, Respondent (The City of Chicago *et al.*, Intervenors).—COMMONWEALTH EDISON COMPANY, Petitioner, v. ILLINOIS COMMERCE COMMISSION, Respondent (The People of Cook County by Richard Devine, Intervenor-Petitioner; The City of Chicago *et al.*, Intervenors).—COMMONWEALTH EDISON COMPANY, Petitioner, v. ILLINOIS COMMERCE COMMISSION, Respondent (The City of Chicago, Intervenor-Petitioner; Environmental Law and Policy Center *et al.*, Intervenors).—COMMONWEALTH EDISON COMPANY, Petitioner, v. ILLINOIS COMMERCE COMMISSION, Respondent (Environmental Law and Policy Center, Intervenor-Petitioner; The City of Chicago *et al.*, Intervenors).—COMMONWEALTH EDISON COMPANY, Petitioner, v. ILLINOIS COMMERCE COMMISSION, Respondent (Citgo Petroleum Corporation Brands, Inc., *et al.*, Intervenors).—COMMONWEALTH EDISON COMPANY, Petitioner, v. ILLINOIS COMMERCE COMMISSION, Respondent (The People of the State of Illinois by the Attorney General James Ryan, Intervenor-Petitioner; The City of Chicago *et al.*, Intervenors).—COMMONWEALTH EDISON COMPANY, Petitioner, v. ILLINOIS COMMERCE COMMISSION, Respondent (Caterpillar, Inc., *et al.*, Intervenors-Petitioners; The City of Chicago *et al.*, Intervenors).

Second District    Nos. 2—01—0038, 2—01—0212, 2—01—0912, 2—01—0914 through 2—01—0917, 2—01—0923 cons.

Opinion filed August 5, 2002.

1040

Paul F. Hanzlik, John L. Rogers, Robert C. Feldmeier, Bryan S. Anderson, and David B. Goroff, all of Foley & Lardner, and Paul R. Bonney and Anastasia M. O'Brien, both of Exelon Business Services Company, both of Chicago, and David W. DeBruin, of Jenner & Block, of Washington, D.C., for petitioner.

James E. Ryan, Attorney General, of Chicago (James E. Weging, Special Assistant Attorney General, of counsel), for respondent.

Richard A. Devine, State's Attorney, of Chicago (Mark N. Pera, Marie D. Spicuzza, Leijuana Doss, and Mitchell Levin, Assistant State's Attorneys, of counsel), for County of Cook.

Howard A. Learner, Albert F. Ettinger, and Shannon Fisk, all of Environmental Law & Policy Center, of Chicago, for Environmental Law & Policy Center.

Eric Robertson, Randall Robertson, and Edward C. Fitzhenry, Jr., all of Lueders, Robertson & Konzen, of Granite City, for Illinois Industrial Energy Consumers, Northwestern Steel & Wire Company, and Caterpillar, Inc.

Mara S. Georges, Corporation Counsel, of Chicago (Lawrence Rosenthal, David A. Graver, and Benna Ruth Solomon, Assistant Corporation Counsel, of counsel), for City of Chicago.

Robert J. Kelter, of Citizens Utility Board, of Chicago, for Citizens Utility Board.

James E. Ryan, Attorney General, of Chicago (Janice A. Dale, Mark G. Kaminski, and R. Lawrence Warren, Assistant Attorneys General, of counsel), for the People.

Christopher J. Townsend, David I. Fein, and Michael S. Mo, all of Piper Rudnick, of Chicago, for Citgo Petroleum Corp., General Mills, Inc., Metropolitan Chicago Healthcare Council, and R.R. Donnelley & Sons Company.

Conrad R. Reddick and Julie M. Hextell, both of Chicago, and Susan M. Landwehr, of Minneapolis, Minnesota, for Enron Energy Services, Inc., and New Energy Midwest, L.L.C.

JUSTICE KAPALA delivered the opinion of the court:

In this consolidated appeal, petitioner, Commonwealth Edison Company (ComEd), appeals directly to this court from an order of respondent, Illinois Commerce Commission (the Commission). The order approved, with modification, ComEd's proposal to collect funds

from ComEd's customers to finance the future decommissioning of nuclear power plants that ComEd transferred to an entity that is not regulated by the Commission. ComEd contends that the Commission erred in reducing its proposed decommissioning rate. The intervenors-petitioners, the People of the State of Illinois by Attorney General James Ryan (State), the People of Cook County by State's Attorney Richard Devine (Cook), the City of Chicago (Chicago), Citizens Utility Board, Environmental Law and Policy Center (ELPC), Illinois Industrial Energy Consumers, which consists of A. Finkl & Sons Company, Abbott Laboratories, Inc., Acme Steel Company, Caterpillar, Inc., Daimler Chrysler Corp., Ford Motor Company, Modern Drop Forge Company, Motorola, Inc., Monsanto Company, and Nabisco Brands, Inc. (IIEC), and Chicago Area Industrial & Health Care Customers Coalition, which consists of Citgo Petroleum Corp., General Mills, Inc., R.R. Donnelly & Sons Company, and Metroplitan Chicago Health Care Council (Coalition) (intervenors-petitioners, collectively, the intervenors), were permitted to intervene in the proceedings before the Commission and have filed separate direct appeals from the Commission's order. All the intervenors challenge the Commission's authority to grant ComEd's petition, and some contend, in the alternative, that the approved decommissioning rates were excessive. For the reasons discussed below, we affirm the order of the Commission.

## I. FACTS

■ These consolidated appeals involve financing the future cost of decommissioning nuclear fission thermal power generating plants (nuclear power plants) in Illinois. According to section 8—508.1(a)(1) of the Public Utilities Act (the Act) (220 ILCS 5/8—508.1(a)(1) (West 2000)), "decommissioning" means:

> "the series of activities undertaken at the time a nuclear power plant is permanently retired from service to ensure that the final entombment, decontamination, dismantlement, removal and disposal of the plant, including the plant site, and of any radioactive components and materials associated with the plant, is accomplished in compliance with all applicable Illinois and federal laws, and to ensure that such final disposition does not pose any threat to the public health and safety." 220 ILCS 5/8—508.1(a)(1) (West 2000).

■ The Act establishes the framework for funding the decommissioning of nuclear power plants. First, public utilities are permitted to seek Commission approval for rate tariffs called "decommissioning rates" charging ratepayers for the future costs of decommissioning a nuclear power plant. 220 ILCS 5/9—201.5 (West 2000)). Second, every public utility that owns or operates, in whole or in part, a nuclear

power plant must establish decommissioning trusts to hold decommissioning funds for the eventual purpose of paying decommissioning costs. 220 ILCS 5/8—508.1(b) (West 2000).

In the past, the Commission has determined the decommissioning rates based on detailed decommissioning cost estimates prepared by industry experts. Decommissioning cost estimates consist of an estimate of the present dollar value of the future cost to decommission each plant, adjusted by a projection of how much related costs such as radioactive waste burial will escalate in the future (escalation rate), while taking into account an estimate of the rate of return earned on the funds already collected and held in the decommissioning trusts (earnings rate). The Commission then prorates these costs over the projected life of each plant, allowing ComEd to collect an annual share of the total estimated decommissioning cost each year.

In the 1994 rate case, the Commission allowed ComEd to recover $112,736,000 in decommissioning costs as part of its base rates for that year and established an annual review of decommissioning rates in a proceeding designated as a "Rider 31" proceeding to determine whether adjustments to that amount should be made in the future. ComEd's decommissioning recoveries have been reviewed and adjusted annually since 1994. The collections that have been authorized in the past have been based on the assumption that ComEd will continue to make collections throughout the terms of the nuclear plants' United States Nuclear Regulatory Commission (NRC) operating licenses. NRC operating licenses are typically 40 years in duration.

■ Article XVI of the Act, titled the Electric Service Customer Choice and Rate Relief Law of 1997 (Customer Choice Law) (220 ILCS 5/16—101 et seq. (West 2000)), was enacted to introduce competition into the Illinois electricity market. 220 ILCS 5/16—101A(b) (West 2000). The General Assembly found that competition would result in lower prices for consumers and increased efficiency and innovation on the part of the power industry. See 220 ILCS 5/16—101A (West 2000). The Customer Choice Law authorizes electric utilities to transfer nuclear power plants to affiliated or unaffiliated entities and to enter into service agreements and power purchase agreements with the transferee. 220 ILCS 5/16—111(g)(3) (West 2000).

On May 18, 2000, in contemplation of a sale of ComEd's nuclear power plants to Exelon Generation Company, LLC (Genco), ComEd filed a petition for approval of a revised Rider 31 which would limit ComEd's recovery of decommissioning costs to a fixed amount over a six-year period. Genco was created in connection with the merger of Chicago-based Unicom Corporation, the parent company for ComEd, and Philadelphia-based PECO Energy Company. This merger spawned

an entity known as Exelon Corporation. Genco is a wholly owned subsidiary of Exelon Corporation. In connection with the transfer of the nuclear power plants, ComEd stated that it intended to enter into a power purchase agreement (PPA), a contribution agreement, and an interconnection agreement with Genco.

Under the PPA, ComEd would obtain all its power supply from Genco through 2004. Up until January 1, 2005, base rates are frozen during the mandatory transition period pursuant to the Customer Choice Law. In 2005 and 2006, ComEd would obtain all its power from Genco, up to the capacity of the nuclear power plants.

Under the terms of the contribution agreement, ComEd would transfer the assets in the decommissioning trusts to Genco, and Genco would be responsible for decommissioning the nuclear power plants. ComEd would be responsible for decommissioning costs in such amounts as shall be approved by the Commission and is obligated to collect those decommissioning costs from its ratepayers and to transfer the funds to Genco.

In its petition, ComEd proposed to collect an annual decommissioning rate of $120,933,333 (rounded for purposes of our discussion to $121 million) which would be assessed to its ratepayers during the years 2001 through 2006. ComEd proposed to collect the same annual share of the total decommissioning cost that it would have sought had it continued to own and operate the nuclear power plants. Under its proposal, after six years ComEd would cease charging decommissioning costs to its ratepayers. While omitting the basis for its calculations, ComEd asserted that its proposal would reduce decommissioning collections from ratepayers by approximately 55%, or $1 billion. ComEd also asserted that its proposal would transfer the risks of increasing decommissioning costs from ComEd and its ratepayers to Genco.

Shortly after ComEd filed its petition, the Commission granted the intervenors' petitions to intervene. Two hearing officers appointed by the Commission conducted an evidentiary hearing on August 24, 2000, through August 29, 2000, at which ComEd, the Commission's staff, and the intervenors presented testimony from a number of experts. This testimony focused on the amount of "just and reasonable" (220 ILCS 5/9—101 (West 2000)) decommissioning costs.

During the proceeding, in response to four issues raised by the Commission staff, ComEd modified its proposal in four ways. The Commission's order discloses:

> "(1) ComEd agreed to obligate Genco to refund to ratepayers any funds that remain in the decommissioning trusts in the unlikely event that there is a surplus after all the nuclear power plants are decommissioned. (2) ComEd has agreed to the inclusion of a

requirement in the trust agreements governing Genco's use of decommissioning funds that, to the extent money is available after radiological decommissioning is completed, nonradiological decommissioning will be performed. (3) ComEd has agreed to a condition making collection of Revised Rider 31 monies from ratepayers in 2005 and 2006 dependent upon ComEd and Genco reaching agreement on a market price and purchasing ComEd's requirements up to the available capacity of the nuclear stations in those years. (4) ComEd has agreed to forever waive any right to seek additional decommissioning collections after the expiration of the six-year decommissioning collection period and to accept this condition in writing."

ComEd moved to stay its 1999 and 2000 Rider 31 cases pending the resolution of this petition. If the merger and transfer of assets to Genco occurred, ComEd committed that it would move to withdraw the petitions filed in those cases.

The parties filed briefs in support of their positions on the question of whether ComEd should be permitted to continue to collect decommissioning costs on behalf of Genco and, if so, the amount of those decommissioning costs.

The hearing examiners filed a proposed order on October 25, 2000, which denied ComEd's petition, concluding that the collection of decommissioning costs from ratepayers after the sale of the nuclear power plants to an unregulated entity was not authorized by the Act.

On December 20, 2000, the Commission disregarded the hearing examiners' proposed order and entered an order granting ComEd's petition as modified. The Commission concluded that ComEd was entitled to recover decommissioning costs each year for six years commencing January 1, 2001. However, instead of the $121 million requested, the Commission adopted certain recommended reductions and authorized ComEd to collect $73 million in decommissioning costs annually for the years 2001-2004. For the years 2005 and 2006, ComEd was permitted to collect an annual amount of decommissioning costs equal to $73 million multiplied by the percentage of the actual energy production of Genco's nuclear power plants that is purchased by ComEd each year.

On December 29, 2000, ComEd filed an application for rehearing (220 ILCS 5/10—113(a) (West 2000)) requesting that the Commission reconsider its reduction of the proposed decommissioning rate. ComEd also requested the Commission to reopen the record to add certain assumptions that were used to determine the decommissioning costs and to include these assumptions in its order. On January 10, 2001, the Commission granted the motion to reopen the record for the limited

purpose of examining whether to amend the order to include a statement of assumptions, but it denied the remainder of ComEd's application for rehearing. On January 12, 2001, ComEd filed a notice of appeal to this court that was docketed as case No. 2—01—0038. Subsequently, the various intervenors filed applications for rehearing. On February 7, 2001, the Commission denied all of the intervenors' applications for rehearing. The Commission entered an amended order on February 21, 2001, that included a statement of assumptions used to calculate the approved decommissioning rate, but its order otherwise remained unchanged. Thereafter, the State, Chicago, Cook, ELPC, IIEC, and the Coalition filed notices of appeal to the First District (IIEC and the Coalition have filed a joint brief and therefore they will be hereinafter referred to as IIEC/Coalition). On February 23, 2001, ComEd filed a second notice of appeal to this court docketed as No. 2—01—0212. In an order entered on April 19, 2001, this court dismissed ComEd's appeal in No. 2—01—0038, finding that we lacked jurisdiction over that appeal. In a supervisory order entered on June 29, 2001, our supreme court directed the vacation of this court's order dismissing ComEd's appeal in No. 2—01—0038. *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 195 Ill. 2d 576 (2001). This court reinstated No. 2—01—0038. On September 19, 2001, our supreme court directed this court to accept a transfer of the intervenors' appeals from the First District. Thereafter, appeal No. 2—01—0212 and the intervenors' appeals were consolidated with appeal No. 2—01—0038.

## II. DISCUSSION

### A. Motions Taken With the Case

The material in this section is nonpublishable under Supreme Court Rule 23 (166 Ill. 2d R. 23).

### B. Authority Under the Act

The threshold question in this appeal is whether the Commission had the legal authority to allow ComEd to impose nuclear decommissioning rates on its ratepayers to contribute toward the cost of decommissioning nuclear power plants that are no longer owned by ComEd but, rather, by the unregulated Genco.

■ An order of the Commission is *prima facie* reasonable, and the party appealing the decision bears the burden of overcoming this presumption of reasonableness. 220 ILCS 5/10—201(d) (West 2000). The scope of our review of an order of the Commission is limited to determining whether the Commission (1) acted within the scope of its authority; (2) made adequate findings in support of its decision; (3)

made a decision that was supported by substantial evidence; and (4) infringed on state or federal constitutional rights. 220 ILCS 5/10— 201(e)(iv)(A) through (e)(iv)(C) (West 2000); *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 322 Ill. App. 3d 846, 849 (2001).

Our supreme court has stated that "[t]he Commission, because it is a creature of the legislature, derives its power and authority solely from the statute creating it, and its acts or orders which are beyond the purview of the statute are void." *City of Chicago v. Illinois Commerce Comm'n*, 79 Ill. 2d 213, 217-18 (1980). The Commission's authority to enter the order appealed in this case must, therefore, find its source in the Act. The Commission's interpretation of a legal issue is not binding on a court of review. *Archer-Daniels-Midland Co. v. Illinois Commerce Comm'n*, 184 Ill. 2d 391, 397 (1998). "However, because of an agency's experience and expertise, courts will generally give substantial weight and deference to the interpretation of a statute by the agency charged with the administration and enforcement of the statute." *Metro Utility Co. v. Illinois Commerce Comm'n*, 262 Ill. App. 3d 266, 273 (1994).

In its order, the Commission determined that "the legislature has authorized the sale of ComEd's nuclear plants and the collection of decommissioning expense from ratepayers after the sale." The Commission implicitly concluded that, if the legislature authorized the postsale collection of decommissioning expenses, it, by virtue of its supervisory powers over public utilities, had the authority to grant ComEd's petition. In doing so, the Commission referenced two sections of the Act. The first, section 9—201.5 (220 ILCS 5/9—201.5 (West 2000)), provides in pertinent part:

"§ 9—201.5. Decommissioning nuclear power plants; rates.

(a) The Commission may after hearing, in a rate case or otherwise, authorize the institution of rate provisions or tariffs that increase or decrease charges to customers to reflect changes in, or additional or reduced costs of, decommissioning nuclear power plants, including accruals for estimates of those costs, irrespective of any changes in other costs or revenues; provided the revenues collected under such rates or tariffs are used to recover costs associated with contributions to appropriate decommissioning trust funds or to reduce the amounts to be charged under such rates or tariffs in the future. These provisions or tariffs shall hereinafter be referred to as 'decommissioning rates.' " 220 ILCS 5/9—201.5 (West 2000).

Although the Commission found "somewhat persuasive" ComEd's argument that section 9—201.5 authorizes the Commission to approve decommissioning collections after the sale of its nuclear power plants,

the Commission recognized that section 9—201.5 does not explicitly mention postsale decommissioning collections. The Commission principally relied upon section 16—114 of the Act (220 ILCS 5/16—114 (West 2000)), which, in the words of the Commission's order, "creates a substantive right in the described entities to recover decommissioning costs after the transfer of nuclear generating units to a third party." Section 16—114 provides, in pertinent part:

"§ 16—114. Recovery of decommissioning charges. On or before April 1, 1999, each electric utility owning an interest in, or having responsibility as a matter of contract or statute for decommissioning costs as defined in Section 8—508.1 of, one or more nuclear power plants shall file with the Commission a tariff or tariffs conforming to the provisions of Section 9—201.5 of this Act, to be applicable to each and every kilowatt-hour of electricity delivered or sold at retail in the electric utility's service area, including, but not limited to, sales by the electric utility to tariffed services retail customers, sales by the electric utility to retail customers pursuant to special contracts or other negotiated arrangements, sales by alternative retail electric suppliers, and sales by an electric utility other than the electric utility in whose service area the retail customer is located ***.

The Commission shall determine whether the tariff meets the requirements of Sections 9—201 and 9—201.5 and of this Section, and shall permit the electric utility's tariff together with any modifications made after hearing to become effective no later than October 1, 1999. In making its determination, the Commission shall retain the authority it possessed prior to the effective date of this amendatory Act of 1997 to make jurisdictional allocations of decommissioning expense recovery." 220 ILCS 5/16—114 (West 2000).

The Commission adopted ComEd's argument that "the language in section 16—114 authorizing 'each electric utility owning an interest in, or having responsibility as a matter of contract or statute for, decommissioning costs,' must be read to contemplate decommissioning recoveries when the utility no longer owns the plant for which it is collecting." The Commission also accepted the argument that any other conclusion would render the "responsibility as a matter of contract" language superfluous and meaningless. The Commission also concluded that although the statute provides that electric utilities seeking recovery of decommissioning charges under section 16—114 shall file with the Commission a tariff on or before April 1, 1999:

"[T]here was no intent on the part of the legislature to put a moratorium on those utilities entitled to collect decommissioning charges and their ability to enter into different arrangements with nuclear units."

The Commission further concluded in its order that when sections 9—201.5 and 16—114 are read together they clearly provide authority for the Commission to approve decommissioning collections when a utility has responsibility as a matter of contract for decommissioning costs. Noting that section 16—114 provides that a utility that has the responsibility as a matter of contract for decommissioning costs " 'shall file with the Commission a tariff or tariffs conforming to the provisions of section 9—201.5,' " the Commission reasoned that, if section 9—201.5 limited decommissioning recoveries to utilities that owned or operated nuclear power plants, "there would be no way for any tariff filed by a utility having responsibility as a matter of contract for decommissioning costs to comply with the requirements of section 16—114."

■ On appeal, Cook and IIEC/Coalition claim that the Commission, after acknowledging that section 9—201.5 does not explicitly mention postsale decommissioning collections, engaged in an inappropriate construction of section 9—201.5. Citing *Gem Electronics of Monmouth, Inc. v. Department of Revenue*, 183 Ill. 2d 470, 475 (1998), these intervenors contend that when the language of the statute is unambiguous it is to be given effect without resorting to other tools of construction. They argue that the statute does not explicitly confer upon the Commission the power to approve postsale decommissioning collections; therefore, that power lies beyond the Commission's authority.

We agree that section 9—201.5 does not speak to the recovery of decommissioning costs after a public utility has sold its nuclear power plants. However, we, like the Commission, find authority in the language of section 16—114, read together with section 9—201.5, for the Commission to permit an electric utility, under certain circumstances, to charge its customers for the future costs of decommissioning nuclear power plants it no longer owns. A statutory provision must not be read in isolation but, rather, must be read in conjunction with other relevant provisions. *Holland v. City of Chicago*, 289 Ill. App. 3d 682, 687 (1997).

Section 16—114 of the Act authorizes electric utilities that (1) own an interest in one or more nuclear power plants, or (2) have responsibility as a matter of contract for decommissioning costs, as defined in section 8—508.1, of one or more nuclear power plants, to file tariffs conforming to the provisions of section 9—201.5. 220 ILCS 5/16—114 (West 2000). Section 16—114 allocates decommissioning cost recovery, in a Customer Choice Law environment, between customers who are being served by the public utility using nuclear power and customers who have switched to an alternative retail sup-

plier. It also expressly recognizes that decommissioning responsibility can arise by contract. The Commission interpreted section 16—114's "responsibility as a matter of contract" language to authorize decommissioning cost collection by ComEd even after the transfer of its nuclear power plants. Although this court is not bound by the Commission's conclusion, its interpretation of a statute it is charged with enforcing is entitled to deference. See *Citizens Utility Board v. Illinois Commerce Comm'n*, 166 Ill. 2d 111, 121 (1995). We agree with the Commission that any other reading of section 16—114 would render the words "responsibility as a matter of contract" meaningless. See *A.P. Properties, Inc. v. Goshinsky*, 186 Ill. 2d 524, 532 (1999) (statute must be construed so that each word, clause, and sentence is given a reasonable meaning and not rendered superfluous).

Therefore, we decline the invitation of Cook and IIEC/Coalition to find that the absence of language in section 9—201.5 explicitly addressing postsale decommissioning collections deprives the Commission of the authority to approve such collections.

Cook and the IIEC/Coalition also argue that because section 9—201.5 was enacted almost three years before section 16—114, the Commission improperly read sections 16—114 and 9—201.5 together. We note, however, that section 16—114 specifically references section 9—201.5; accordingly, we reject this argument.

■ Because we are dealing with ComEd's postsale proposal regarding decommissioning costs, we must prefatorily decide if ComEd has "responsibility as a matter of contract" for the decommissioning costs of the nuclear power plants it will transfer to Genco. "The construction of a contract and the determination of the rights and obligations of the parties to the contract are questions of law, the determination of which rests exclusively with the court." *Zurich Insurance Co. v. Raymark Industries, Inc.*, 118 Ill. 2d 23, 58 (1987).

The State and ELPC claim that ComEd has no such responsibility. As ELPC's argument on this issue mirrors that of the State, we will resolve both by specifically addressing the State's contentions.

The State asserts that the Commission's order fails to acknowledge the difference between contractual liability for the actual "decommissioning costs" of the nuclear power plants and contractual obligation to collect "decommissioning charges" on behalf of Genco. The State concludes that ComEd does not retain any responsibility for "decommissioning costs" under the contribution agreement but, rather, transfers all the decommissioning liability to Genco, and ComEd is only contractually obligated to collect decommissioning charges on behalf of Genco and remit them to Genco.

ComEd responds by asserting that under the contribution agree-

ment it retains a contractual obligation to pay a portion of the full liability for decommissioning the nuclear power plants. We agree with ComEd and believe that the State mischaracterizes the contribution agreement.

The contribution agreement states:

> "(c) *Decommissioning.* [Genco is responsible] for decommissioning the Stations in compliance with all Requirements of Laws, including responsibility for establishing, maintaining and funding (except to the extent, and only to the extent, otherwise provided in *Section 6.6* (Decommissioning Costs)) such financial assurance mechanisms as shall be required to provide for such decommissioning under such Requirements of Laws.
>
> * * *
>
> 6.6 *Decommissioning Costs.* Transferor will remain liable as a matter of contract pursuant to this agreement for Decommissioning Costs in respect of the Stations in such amounts as shall be approved by the Illinois Commerce Commission and shall be actually collected by Transferor. Transferor will also retain the obligation to collect unfunded Decommissioning Cost charges in the manner provided in 220 ILCS 5/9—201.5 and 220 ILCS 5/16—114 and any other applicable laws, regulations or tariffs, including Rider 31— Decommissioning Expense Adjustment Clause, to the extent that the Illinois Commerce Commission approves such collections and Transferor actually collects such charges. Transferor will forward the funds so collected to Transferee at least annually for deposit to decommissioning trust funds maintained by Transferee."

ComEd contracted to transfer its nuclear plants, as well as the $2.5 billion in the decommissioning trusts, to Genco. There is no question that the parties intended to transfer the ultimate decommissioning obligation to Genco. However, pursuant to section 6.6 of the contribution agreement, ComEd agreed to "remain liable" for the future decommissioning costs in an amount equal to that approved by the Commission to be collected over the six years of the PPA. ComEd's petition proposed an amount of $121 million annually for six years. The Commission thought a different amount was appropriate and so ordered. Under the contribution agreement, ComEd actually transferred to Genco the responsibility for the amount of decommissioning costs that exceeded the sum of $2.5 billion in the trust funds and the $73 million annual decommissioning rate collections for four to six years.

The State points out that ComEd has referred to its obligation regarding decommissioning costs as a collection agency agreement in various documents, including the "ComEd Decommissioning Fund-

ing—Special Decommissioning Rider." The contribution agreement, however, is the legally operative document, and it specifically addresses the allocation of the liability for decommissioning costs.

■ Moreover, even if we were to accept the State's characterization of ComEd's responsibility under the contribution agreement as a collection agreement, we do not agree that this distinction voids ComEd's legal authority to charge its ratepayers during the six-year period from 2001 to 2006 for decommissioning costs. The State concedes that the Act authorizes a utility to collect decommissioning costs from ratepayers where that utility has the responsibility as a matter of contract. In the context of this case, the legal significance of ComEd's contractual responsibility is, as a practical matter, the same whether we label that responsibility a liability to pay a portion of the ultimate decommissioning costs or an agreement to collect the decommissioning costs for Genco. Additionally, to the extent that the contribution agreement language could be interpreted as making ComEd either liable for collection only or liable for the actual costs, there is a preference for construing a contract so that it is rendered enforceable rather than void (*Liccardi v. Stolt Terminals, Inc.*, 178 Ill. 2d 540, 549 (1997)).

In summary, we believe that ComEd has the responsibility as a matter of contract for decommissioning costs as defined in section 16—114.

■ The State also argues that, on the issue of ComEd's responsibility for decommissioning under the contribution agreement, the Commission's order lacks the analysis necessary to withstand judicial scrutiny as required by section 10—201(e)(iii) of the Act (220 ILCS 5/10—201(e)(iii) (West 2000)). We disagree.

The Act obliges the Commission to provide "findings or analysis sufficient to allow an informed judicial review." 220 ILCS 5/10—201(e)(iii) (West 2000). The Commission must set forth more reasoning and analysis than would be acceptable from a circuit court. *Citizens Utility Board v. Illinois Commerce Comm'n*, 291 Ill. App. 3d 300, 309 (1997). The portion of the Commission's order dealing with its power to authorize ComEd to collect decommissioning rates pursuant to section 16—114 and 9—201.5 is approximately three pages long. The order adopts ComEd's argument that section 16—114 contemplates decommissioning recoveries even after the utility no longer owns the plant for which it is collecting. The Commission also wrote, "The position of both ComEd and Staff about the meaning of the 'responsibility as a matter of contract' language is reasonable and grounded in a straightforward reading of Section 16—114." In addition, the contribution agreement, which creates ComEd's liability for decommissioning costs, is in the record and speaks for itself. Accordingly, we conclude that the Commission's analysis is sufficient for our informed review.

■ The State and ELPC argue that ComEd cannot be responsible for decommissioning costs under the terms of the contribution agreement because decommissioning costs are "reasonable costs and expenses incurred *** at the time of decommissioning" (220 ILCS 5/8—508.1(a)(2) (West 2000)) and, under the terms of the contribution agreement, ComEd will have no liability at the time decommissioning actually occurs.

ComEd points out that section 16—114 refers to a utility "having responsibility as a matter of contract or statute for decommissioning costs as defined in Section 8—508.1" and not to a utility having liability for the full expense of decommissioning at the time decommissioning actually occurs. 220 ILCS 5/16—114 (West 2000). ComEd argues that, because the funds ComEd collects for deposit into the decommissioning trusts will ultimately be spent for "expenses incurred in connection with the entombment, decontamination, dismantlement, removal and disposal of the structures, systems and components of a nuclear plant at the time of decommissioning," these funds are decommissioning costs within the meaning of sections 16—114 and 8—508.1. We agree.

Section 8—508.1(a)(2) of the Act defines "decommissioning costs" as follows:

"(2) 'Decommissioning costs' means all reasonable costs and expenses incurred in connection with the entombment, decontamination, dismantlement, removal and disposal of the structures, systems and components of a nuclear power plant at the time of decommissioning, including all expenses to be incurred in connection with the preparation for decommissioning, such as engineering and other planning expenses, and to be incurred after the actual decommissioning occurs, such as physical security and radiation monitoring expenses, less proceeds of insurance, salvage or resale of machinery, construction equipment or apparatus the cost of which was charged as a decommissioning expense." 220 ILCS 5/8—508.1(a)(2) (West 2000).

Clearly, an entity can have responsibility for future decommissioning costs and satisfy that responsibility before decommissioning actually occurs. In fact, the statute specifically contemplates prospective expenses by using the words "to be incurred." The purpose of these statutes is to ensure that funds are available to pay the decommissioning costs when a nuclear power plant is closed. In construing statutes, we must examine the entire statute as a whole and consider the objective and purpose of the statute. *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 328 Ill. App. 3d 937, 942 (2002). Consequently, we reject this contention of the State and ELPC.

■ In its order, the Commission found that even though section 16—114 required that the tariffs it authorized be filed on or before April 1, 1999, there was no legislative intent to disregard petitions to collect decommissioning charges filed after that date.

Cook argues that the dates contained in section 16—114 place a limitation on the contracts that can be recognized for recovery of decommissioning expenses. ELPC argues that by holding that section 16—114 somehow authorizes ComEd's petition, which was filed in May 2000 and granted in December 2000, the Commission rendered the date limitations in section 16—114 superfluous and thereby violated a rule of statutory construction (*A.P. Properties, Inc.*, 186 Ill. 2d at 532).

As stated previously, the purpose of section 16—114 is to allocate decommissioning cost recovery between customers purchasing power from a utility employing nuclear power and customers who have switched to an alternative electric supplier. However, section 16—114 also recognizes a utility's ability to collect decommissioning charges from ratepayers when it has the responsibility for decommissioning costs as a matter of contract. Several parties concede that ComEd complied with the required filing date with respect to its existing Rider 31 tariff. Further, section 16—114 does not prohibit ComEd from entering into an agreement after April 1, 1999, that transfers ownership of the nuclear power plants but under which ComEd retains the responsibility for some of the decommissioning costs. In our view, April 1, 1999, is the date by which the tariff contemplated in section 16—114 must be filed in order to become effective on or before October 1, 1999. We read the April 1, 1999, limitation to be inapplicable to section 16—114 tariffs that are to take effect after October 1, 1999. To characterize April 1, 1999, as an absolute deadline would create a brief window to implement decommissioning rate tariffs at any time in the future. This would be inconsistent with the intent of the statute and frustrate one of its major purposes, which is to assure that sufficient funds are being set aside to fully decommission all nuclear plants within Illinois. We will presume that the General Assembly did not intend to create an absurd result. *Cummins v. Country Mutual Insurance Co.*, 178 Ill. 2d 474, 479 (1997). Therefore, we affirm the Commission's interpretation that the April 1, 1999, date in section 16—114 was not intended to put a moratorium on the ability to enter into different ownership arrangements beyond that date.

■ The State, the ELPC, and the IIEC/Coalition argue that the Commission's order violates the Act by allowing ComEd to act as an agent for Genco. They contend that, under the Act, only a utility can collect decommissioning rates and Genco is not a utility. They conclude

that by allowing ComEd, acting as Genco's agent, to collect decommissioning rates pursuant to the collection agency agreement, the Commission's order allows ComEd to do for Genco what Genco cannot under the Act legally do for itself. Relying on a tenet of agency law that provides that an agent's authority to act can be no greater than the authority of its principal (3 Am. Jur. 2d *Agency* § 68, at 483 (2002)), the intervenors further contend that ComEd, as an agent, labors under the same restrictions as its principal, Genco. They assert that because Genco is not a utility and cannot collect a decommissioning cost tariff, neither then can ComEd.

These arguments fail because ComEd is not Genco's agent. As we concluded above, ComEd is collecting decommissioning charges on behalf of itself to meet its obligation to pay decommissioning costs under the contribution agreement. Sections 9—201.5 and 16—114 of the Act provide authority for the Commission's approval of ComEd's plan to collect decommissioning costs from its ratepayers in order to satisfy its obligation under the contribution agreement. Therefore, ComEd's tariff is authorized by law and does not, by the way of an agency arrangement, violate the Act.

■■■ Chicago argues that the Commission's order violates section 9—201.5 of the Act. The tariffs authorized under section 16—114 must conform to the provisions of section 9—201.5. 220 ILCS 5/16—114 (West 2000). Section 9—201.5 authorizes the Commission to allow the institution of rate provisions or tariffs for the costs of decommissioning nuclear power plants provided the revenues collected are used (1) to recover costs associated with contributions to appropriate decommissioning trust funds, or (2) to reduce the amounts to be charged under such rates or tariffs in the future. 220 ILCS 5/9—201.5 (West 2000).

Chicago contends that neither of these circumstances is present in this case. First, Chicago contends that the funds from the decommissioning rates that ComEd proposes to collect cannot be used to recover costs associated with contributions to appropriate decommissioning trust funds. Chicago claims that because decommissioning trust funds, as described in section 8—508.1(b) (220 ILCS 5/8—508.1(b) (West 2000)), are established by public utilities that own nuclear power plants, ComEd, no longer owning or operating any nuclear power plants, could not use the funds collected to recover costs associated with contributions to appropriate decommissioning trust funds. We disagree.

Section 8—508.1(a)(3) defines "decommissioning trust" as:

"[A] fiduciary account in a bank or other financial institution established to hold the decommissioning funds provided pursuant

to subsection (b)(2) of this Section for the eventual purpose of paying decommissioning costs, which shall be separate from all other accounts and assets of the public utility establishing the trust." 220 ILCS 5/8—508.1(a)(3) (West 2000).

In turn, section 8—508.1(b)(2) provides in pertinent part:

"[E]very public utility that owns or operates, in whole or in part, a nuclear power plant shall:

\*\*\*

(2) establish 2 decommissioning funds for each such plant, each of which shall be held for a plant as a separate account in a decommissioning trust[.]" 220 ILCS 5/8—508.1(b)(2) (West 2000).

We do not believe that these definitions limit the source of the funds going into the decommissioning trust funds to owners and operators of nuclear power plants. The statutes do not prohibit the deposit of funds into the decommissioning trusts from sources other than owners and operators of nuclear power plants. Also, section 8—508.1 requires only that public utilities establish the decommissioning trusts; it does not prohibit other business entities from maintaining or collecting money for them.

■ At oral argument, counsel for Chicago took the position that, as a result of the transaction between ComEd and Genco, those trust funds that were established under section 8—508.1 were dissolved and only the assets that were in the trust funds were transferred to Genco. We disagree.

Under section 2.1(j) of the contribution agreement, ComEd is required to transfer to Genco "decommissioning trust assets," which are defined as:

"(1) All assets (including investments) held in Decommissioning Trusts and (2) all funds collected, or to be collected, from ratepayers in Respect of Decommissioning Costs as provided in *Section 6.6 (Decommissioning Costs)*." (Emphasis in original.)

We conclude that this language contemplates that the assets remain subject to the terms of the trusts. This conclusion is supported by reading sections 6.6 and 1.1 of the contribution agreement.

Under section 6.6 of the contribution agreement, ComEd is required to pay decommissioning costs as determined by the Commission and to forward the funds to Genco at least annually for deposit into decommissioning trust funds maintained by Genco. Section 1.1 of the contribution agreement defines "decommissioning trusts" as follows:

"the trusts established under the Trust Agreement dated December 8, 1988, as amended (Tax Qualified Decommissioning Trust) between [ComEd] and the Northern Trust Company and the Trust Agreement dated December 8, 1988, as amended (Non-Tax Quali-

fied Decommissioning Trust) between [ComEd] and the Northern Trust Company."

We can conclude only that the trusts referred to were those established in accordance with all the requirements of section 8—508.1. Therefore, contrary to Chicago's position, the section 8—508.1 decommissioning trust funds remain intact.

We also note that section 16—114 recognizes a public utility's ability to file a tariff to collect decommissioning rates where it has responsibility as a matter of contract for decommissioning costs. 220 ILCS 5/16—114 (West 2000). It would be illogical for provisions of the Act to allow ComEd to collect decommissioning rates to satisfy its obligation under the contribution agreement and then seal those funds off from deposit into the accounts established to hold funds for the eventual purpose of paying decommissioning costs. We will presume that the General Assembly did not intend to create an absurd or unjust result. *Cummins v. Country Mutual Insurance Co.*, 178 Ill. 2d 474, 479 (1997).

Chicago also argues that the second purpose to which decommissioning rates must be applied pursuant to section 9—201.5 is inapplicable in this case. Chicago takes the position that the hearings before the Commission focused on determining the likely total cost of decommissioning, the likely escalation in decommissioning costs over the years before decommissioning actually takes place, the likely growth through investment income of the decommissioning trusts over those same years, and the likely number of years remaining before decommissioning. Considering all of this, the Commission approved the collection of $73 million per year for four to six years based on the Commission's best estimate of what would be needed to pay all the decommissioning costs of all 13 nuclear power plants. Chicago contends that the Commission did not identify any actual savings to ComEd's ratepayers that will flow from its order and concludes that a tariff that simply raises a sum that is equal to expected future decommissioning expenses does not, by definition, reduce those amounts.

ComEd argues that the decommissioning costs are reduced because ComEd customers will not have to pay a decommissioning tariff after 2006.

We believe that Chicago misconstrues section 9—201.5 as requiring that decommissioning rates collected now must somehow reduce the total amount of the price for decommissioning as of the time it actually takes place. In our view, section 9—201.5 requires only that funds collected pursuant to decommissioning rates must be applied so as to reduce the amounts that customers will have to pay later.

The proposal in the petition, approved as modified, eliminates ratepayers' liability for decommissioning costs after four to six years. The $121 million per year in decommissioning rates proposed by ComEd was based on the amount requested by ComEd in its 1999 decommissioning rate case (*In re Commonwealth Edison*, Ill. Com. Comm'n Rep. No. 99—0115). That amount was calculated by TLG Services, Inc. (TLG), assuming that decommissioning rates would be collected for the operating life of the nuclear power plants. The operating life was assumed to be equal to the length of the nuclear power plants' NRC operating licenses. The Commission reduced the $121 million per year to $73 million per year, but the amount will be collected for only 4 to 6 years, not the 27 years based on the expiration of the last NRC operating license. Also, the decommissioning cost estimates calculated in year 2000 dollars prepared by TLG totaled $5.649 billion (rounded for purposes of our discussion to $5.6 billion), or $3.1 billion more than the amount in the decommissioning trusts at the time the petition was filed. ComEd's proposed decommissioning rate was $121 million per year, with a maximum of $726 million. The approved decommissioning rate was $73 million for four to six years, or a maximum total of $438 million in decommissioning rates, which is significantly less than the estimated deficit in the decommissioning trusts of $3.1 billion. Ratepayers are liable for decommissioning costs in years five and six of the purchase power agreement only to the extent that ComEd buys power from Genco. Absent this plan, ComEd's ratepayers would have to pay all the decommissioning costs with respect to ComEd's nuclear power plants. Clearly, the Commission's order works to reduce the amount of decommissioning rates ComEd customers will be required to pay in the future.

Moreover, decommissioning costs have to be paid at some point in the future. All of the money ComEd collects for decommissioning purposes is applied to those costs. Money collected now will not have to be collected later. It follows then that the money collected pursuant to the Commission's order reduces the amounts necessary to be charged by ComEd in future years.

Even though decommissioning rates authorized by the Commission must satisfy only one of the requirements of section 9—201.5, as we have explained, the decommissioning rates authorized in this case satisfy both requirements. Therefore, we reject Chicago's arguments that section 9—201.5 has been contravened by the Commission's order.

█ On appeal, the intervenors make assorted arguments that were rejected by the Commission, contending that section 16—114.1 of the Act (220 ILCS 5/16—114.1 (West 2000)) bars ComEd's postsale collection of decommissioning rates. The Commission's order references section 16—114.1, which provides in pertinent part:

"§ 16—114.1. Recovery of decommissioning costs in connection with nuclear power plant sale agreement.

(a) An electric utility *owning a single-unit nuclear power plant* located in this State which enters into an agreement to sell the nuclear power plant and as part of such agreement agrees: (i) to make contributions to a tax-qualified decommissioning trust or non-tax qualified decommissioning trust, or both, as defined in Section 8—508.1 for the nuclear power plant, in specified amounts or for a specified period of time, after the sale is consummated, or (ii) to purchase an insurance instrument which provides for the payment of all or a specified amount of the decommissioning costs of the nuclear power plant, shall be entitled, in the case of item (i), to maintain such decommissioning trusts for the purpose of receiving such contributions after the consummation of the sale, to implement revisions to its decommissioning rate in accordance with subsection (b) of this Section, and to transfer such decommissioning trusts, or the balance in the trusts, to the buyer of the nuclear power plant in accordance with the agreement of sale, and in the case of item (ii), to implement revisions to its decommissioning rate in accordance with subsection (c) of this Section.

(b) An electric utility entering into an agreement of sale described in subsection (a)(i) of this Section shall be entitled to file a petition with the Commission for entry of an order authorizing the electric utility (i) to amortize its liability for decommissioning costs pursuant to the agreement of sale over the period of time in which the electric utility is required by such agreement to make additional contributions to the tax-qualified decommissioning trust, the non-tax qualified decommissioning trust, or both, and (ii) to revise its decommissioning rate to a level that will recover, over the time period specified in the agreement of sale, an annual amount equal to the electric utility's annual contributions to the decommissioning trusts which are required by the agreement of sale multiplied by the percentage of the output of the nuclear power plant which the agreement of sale obligates the electric utility to purchase in each such year.

(c) An electric utility entering into an agreement of sale described in subsection (a)(ii) shall be entitled to file a petition with the Commission for entry of an order authorizing the electric utility to revise its decommissioning rate to a level that will recover, over 5 years, the electric utility's cost of purchasing the insurance instrument multiplied by the percentage of the output of the nuclear power plant which the agreement of sale obligates the electric utility to purchase in each such year." (Emphasis added.) 220 ILCS 5/16—114.1 (West 2000).

IIEC/Coalition submits that the legal maxim *expressio unius est*

*exclusio alterius* applies, pursuant to which a court may find that, when certain things are listed or specified in a statute, the legislative intent to exclude all other things from the statute's operation may be inferred (see *In re Consensual Overhear,* 323 Ill. App. 3d 236, 240 (2001)). IIEC/Coalition contends that, because section 16—114.1 grants authority for the Commission to approve an electric utility selling only one nuclear power plant to collect postsale decommissioning rates, but does not give the Commission the authority to approve the same act by a utility selling more than one nuclear power plant, ComEd is prohibited from doing so in this case. However, because we have concluded that sections 9—201.5 and 16—114 provide authority for ComEd's collection of decommissioning rates in this case, the inference created by *expressio unius est exclusio alterius* is inapplicable here.

Chicago also notes that section 16—114.1 gives electric utilities owning a single-unit nuclear power plant the authority to collect postsale decommissioning costs. Chicago reasons that if ComEd, owning more than one nuclear power plant, has this same authority under the Commission's interpretation of sections 9—201.5 and 16—114, then section 16—114.1 is rendered meaningless. Chicago concludes, therefore, that the Commission's interpretation of sections 9—201.5 and 16—114 must be erroneous. Chicago's argument on this issue mirrors like arguments of other intervenors; therefore, we will resolve all of the intervenors's arguments on this issue by specifically addressing Chicago's contentions.

The Commission recognized that there was an "overlap of authority" between the authority granted in section 16—114.1 permitting postsale decommissioning rates and the general authority available under sections 9—201.5, 8—508.1, and 16—114 to do the same thing. The Commission, however, also noted that section 16—114.1 "provides detailed guidance regarding post nuclear plant sale decommissioning trusts and future collections for utilities owning one nuclear power plant. Section 16—114.1 does not restrict the Commission in evaluating post-plant sale decommissioning cost proposals for utilities owning more than one plant" and concluded that "[s]ection 16—114.1 of the Act is not a bar to post-plant sale decommissioning collection by ComEd." We agree with the Commission's conclusion for the reason that section 16—114.1 contains provisions that are not in sections 9—201.5 and 16—114.

Section 16—114.1 gives an electric utility owning a single-unit nuclear power plant an option in the event of a sale to purchase an insurance instrument to pay decommissioning costs. 220 ILCS 5/16—114.1(a)(ii) (West 2000). Sections 9—201.5 and 16—114 carry no such

option. Additionally, the Commission's discretion is greatly limited in the approval of the postsale petition to collect a decommissioning tariff meeting the requirements of section 16—114.1. Subsection (d), *inter alia*, illustrates this point by providing, "The Commission *shall* issue an order granting the petition within 30 days after the petition is filed." (Emphasis added.) 220 ILCS 5/16—114.1(d) (West 2000). The word "shall" in a statute is generally indicative of mandatory intent. *People v. Porter*, 122 Ill. 2d 64, 85 (1988). On the other hand, the Commission has broad authority to grant, modify, or deny a petition to file a decommissioning rate tariff pursuant to section 9—201.5. Section 9—201.5(a) provides in pertinent part:

> "(a) The Commission *may* after hearing, in a rate case or otherwise, authorize the institution of rate provisions or tariffs that increase or decrease charges to customers to reflect changes in, or additional or reduced costs of, decommissioning nuclear power plants ***." (Emphasis added.) 220 ILCS 5/9—201.5(a) (West 2000).

The authority for the postsale collection of decommissioning rates granted in section 16—114.1 alters those provisions in sections 16—114 and 9—201.5 giving like authority. Accordingly, we reject Chicago's argument that the Commission's interpretation of the Act renders section 16—114.1 meaningless and its consequent argument that section 16—114.1 vitiates the Commission's authority to approve ComEd's postsale collection of decommissioning rates.

For the foregoing reasons, we agree with the Commission's conclusion that sections 16—114 and 9—201.5 of the Act provide the statutory authority to grant ComEd's petition as modified.

### C. Challenges to the Amount of the Approved Decommissioning Rate

The material in this section is nonpublishable under Supreme Court Rule 23 (166 Ill. 2d R. 23).

### III. CONCLUSION

Based on the foregoing, we affirm the Commission's order.

Affirmed.

BOWMAN and CALLUM, JJ., concur.