In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-2878

DAVID W. PENNINGTON, *et al.*, on behalf of themselves and
all others similarly situated,

*Plaintiffs-Appellants*,

*v.*

ZIONSOLUTIONS LLC and BANK OF NEW YORK MELLON,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 C 4754 — **Joan Humphrey Lefkow**, *Judge*.

ARGUED JANUARY 7, 2014 — DECIDED JANUARY 31, 2014

Before WOOD, *Chief Judge*, and POSNER and KANNE, *Circuit Judges*.

POSNER, *Circuit Judge*. This is a class action suit on behalf of purported beneficiaries of a "decommissioning trust" (actually four such trusts, but that's an immaterial detail, so we'll ignore it and pretend they're one) created by Commonwealth Edison, the large electrical utility, to fund the decommissioning of its now-shuttered nuclear power plant in

Zion, Illinois. Jurisdiction is based on diversity of citizenship and the applicable substantive law is Illinois's, though federal regulation of decommissioning lurks in the background. The plaintiffs and the other class members are ComEd customers. The two defendants are the current trustee (BNY Mellon) of a trust (the Zion Trust) containing the assets that were originally in the ComEd trust, and the company that is doing the decommissioning (ZionSolutions) and drawing on the assets of the Zion Trust to pay for its work.

ComEd closed the Zion plant in 1998. When a nuclear facility is closed, it must be "decommissioned," which means rendered harmless, that is, cease to be dangerously radioactive. The process of decommissioning is supervised by a federal agency, the Nuclear Regulatory Commission. There are several methods of decommissioning. The one originally chosen for the Zion plant is called SAFSTOR (short for "safe storage"). That method requires that the defunct plant be enclosed in a way that prevents radioactive leakage, and that it remain in this state for many years—usually 40 to 60. By the end of that period the natural decay of radioactive materials will have rendered the plant much less radioactive, thereby reducing the cost of dismantling the plant and eliminating any dangerous radioactive residue. Thus in SAFSTOR the dismantlement and decontamination of a nuclear power plant are deferred for decades.

But then it was decided to substitute for SAFSTOR as the method of decommissioning the Zion plant a method called DECON (short for decontamination). In DECON, as much as possible of the radioactive material is removed from the site and sent to a nuclear waste dump to decay in peace, enabling the decontamination of the site to be completed much

more rapidly than if SAFSTOR were used. See U.S. NRC, "Decommissioning Nuclear Power Plants," July 10, 2013, www.nrc.gov/reading-rm/doc-collections/fact-sheets/decom missioning.html (visited Jan. 31, 2014); Matthew L. Wald, "After the Nuclear Plant Powers Down," *New York Times*, Nov. 23, 2010, p. B1.

Regulations of the Nuclear Regulatory Commission require a nuclear plant operator, at the very outset of operations, to begin accumulating money—typically by creating a decommissioning trust funded by charges to ratepayers— sufficient to finance the eventual decommissioning, which is likely to cost hundreds of millions of dollars. See 10 C.F.R. § 50.75; 18 C.F.R. § 35.32. But the details of the creation of the trust fund are left to the state agency that regulates the utility, in this case the Illinois Commerce Commission, which pursuant to a provision of the Illinois Public Utilities Act, 220 ILCS 5/9-201.5(a), authorized ComEd to create a trust (with Northern Trust Company as trustee) to be funded by some $700 million in charges levied by ComEd on its customers. The Act entitles ComEd's customers to the return of any money that has not been spent when the decommissioning is completed, 220 ILCS 5/8-508.1(c)(3)(ii), because financing the decommissioning was the only purpose for which the charges deposited in the ComEd trust had been levied on the utility's customers.

In 2001, with the permission of the Illinois Commerce Commission (see *In re Commonwealth Edison Co.*, No. 00-0361, 2001 WL 1033288 (ICC Feb. 21, 2001), affirmed, *Commonwealth Edison Co. v. ICC*, 775 N.E.2d 113 (Ill. App. 2002); see also the Commission's "e-docket," case no. 00-0361, www.icc.illinois.gov/docket/files.aspx?no=00-0361&docId=

112852 (visited Jan. 31, 2014)), ComEd transferred ownership of the Zion plant, together with the trust assets, to ComEd's parent, Exelon (actually to Exelon Generation Company, a subsidiary of Exelon, but that's another detail we can ignore). Neither Exelon nor its subsidiary is a public utility. Ordinarily the utility (ComEd) would have retained the plant after shutting it down, and hired a contractor to decommission the plant. But economies were anticipated from getting the utility out of the picture; transaction costs would be reduced by uniting financing and decommissioning in the same company. (See Wald, *supra*, for a fuller discussion.) Another step was necessary, however: Exelon transferred plant and trust assets to a company created to do the actual decommissioning—ZionSolutions. This enabled a further economy, besides uniting financing and decommissioning, inasmuch as ZionSolutions' parent, EnergySolutions, owns a nuclear waste site, which plays an essential role in the DE-CON decommissioning method; for it is to such a site that radioactive material removed from the shuttered plant is taken. Because neither party to the transfer of the trust assets was an Illinois public utility, the permission of the Illinois Commerce Commission to make the transfer was not required.

By the terms of the transfer, the assets originally in ComEd's trust were placed in a new trust, the Zion Trust, with BNY Mellon as trustee. The trust assets are to be used to pay ZionSolutions' decommissioning costs. The transfer agreement provides that should there be unspent money in the trust when the decommissioning is complete, that money will be returned to Exelon, which in turn will remit it to ComEd for distribution to ComEd's customers, just as if the money had been in ComEd's trust all the time. The transfer

agreement also provides that if the decommissioning costs exceed the trust's remaining assets (as the Illinois commission thought likely), ZionSolutions must swallow them; it will not be permitted to seek reimbursement of any excess costs from ComEd or ComEd's customers.

The plaintiffs brought this suit against ZionSolutions and the bank in 2011, claiming that the trust funds are being misused in violation of both the Illinois Public Utilities Act and Illinois's common law of trusts. The suit seeks the appointment of a new trustee, an accounting, an injunction against improper expenditure of trust funds, an order directing that "at least some of the trust funds" be disbursed to ComEd customers at once, and other relief. The district court, without deciding whether to certify a class, dismissed the complaint for failure to state a claim.

There's been no determination that ZionSolutions or BNY Mellon *has* mismanaged trust assets, but suppose one or both of them have. The plaintiffs and other class members are not beneficiaries of the Zion Trust. The only beneficiary is Exelon, the source of the trust money. ComEd's customers have rights only to the money, if any, left unspent in the Zion Trust and therefore returned via Exelon to ComEd when the decommissioning of the Zion plant has been completed.

The Illinois Public Utilities Act does impose duties on trusts administered by the utility companies regulated by the Illinois Commerce Commission, but the plaintiffs are not complaining about the administration of the ComEd trust, which in any event is an empty shell. They haven't named ComEd, ComEd's trust, or Northern Trust Company as defendants. How could they? Their rights, as we said, are limited to any Zion Trust assets that remain after the decom-

missioning is completed. (It is also far from clear that the Illinois Public Utilities Act creates a private right of action, cf. *Fisher v. Lexington Health Care, Inc.*, 722 N.E.2d 1115, 1117–20 (Ill. 1999), but that is not an issue we need try to resolve in this case.)

The Illinois Commerce Commission's approval was required for the transfer of the assets from the ComEd trust to Exelon, ComEd's parent, and that approval was given after an administrative proceeding (the *Commonwealth Edison* proceeding cited earlier) in which the plaintiffs could have objected to the transfer, but did not, though other ComEd customers did. See *In re Commonwealth Edison Co.*, *supra*, 2001 WL 1033288, at *1–2. With that approval, ComEd and its customers are out of the picture unless and until there is money left over from the decommissioning.

Still, the plaintiffs and the other class members have a residual interest in the assets now in the hands of ZionSolutions and BNY Mellon. A theft or squandering of any of those assets will reduce the probability that ComEd customers will receive any refunds when the decommissioning is complete. But there is a difference between an interest and a right. Imagine there is hanky-panky in the management of a company, resulting in a deterioration in service. A consumer who had planned to buy goods produced by the company and cannot find an adequate substitute will be harmed. Yet assuming he has no contractual rights against the company—no promise by the company to sell him goods of a specified quantity and quality at a specified price—he'll have no *legal* claim against the company, or whoever in the company was responsible for its deterioration. It is the same here. The plaintiffs and class members are not the beneficiaries of the

Zion Trust and have no contractual relationship with it, ZionSolutions, or BNY Mellon, and therefore no basis for asserting legal claims against any of those entities.

And for good reason: had ComEd's customers a cause of action against the decommissioner of the Zion nuclear plant for mismanaging the project, no reputable firm would have agreed to undertake the project or act as trustee of the project assets without an ironclad agreement by ComEd or Exelon to indemnify the decommissioning company and the trustee for any damages and litigation expenses. ComEd has more than three and a half million customers. On the plaintiffs' legal theory any or all of them could sue ZionSolutions or BNY Mellon for breach of trust.

The plaintiffs point us to the antique and obscure concept of the "trustee *de son tort*" (that is, trustee by virtue of his tortious act—essentially, a constructive trustee). E.g., *Penn v. Fogler*, 55 N.E. 192, 197 (Ill. 1899); *Easterly v. Barber*, 65 N.Y. 252, 259 (1875); *People v. Houghtaling*, 7 Cal. 348, 352 (1857); *King v. Johnston*, 101 Cal. Rptr. 3d 269, 282–84 (Cal. App. 2009). "Where it is obvious that no technical trust results, the courts have often employed trust doctrine as a remedial device to impose a duty upon one who takes possession and control of another's property." Note, "Creditor's Liability for Mismanagement of Debtor Corporation," 47 *Yale L.J.* 1009, 1012 (1938). "A person who intermeddles with and assumes the management of property without authority becomes a trustee *de son tort*, liable for the damages occasioned by his intermeddling." *Id.* at 1012 n. 17. The plaintiffs accuse the bank and ZionSolutions of being trustees *de son tort* of assets that really belong to ComEd and its customers, with Northern Trust as trustee.

That's a feeble argument. The transfer of trust and assets from ComEd and Northern Trust Company to Exelon and thence to ZionSolutions and BNY Mellon was lawful. The bank is not a usurper, an intermeddler, a trustee *de son tort*— it has committed no tort. And if we're wrong and it has mismanaged trust assets, its only victim, in the eyes of the law, is Exelon, the sole beneficiary of the Zion Trust. Nevertheless we might strain to find a cause of action for ComEd's customers if Exelon, as the sole beneficiary of the Zion trust, alone had a legally enforceable right to complain about misuse of the trust's funds by ZionSolutions or BNY Mellon. Exelon is required by the terms of the agreement that created the Zion Trust to pass on any refund of trust moneys to ComEd for distribution to ComEd's customers. But maybe Exelon doesn't care much about returning money to ComEd customers and so may not enforce its rights as trust beneficiary diligently. No matter. The decommissioning of nuclear facilities is closely regulated by the Nuclear Regulatory Commission, and its regulatory authority embraces every potential malfeasance or misfeasance of assets dedicated to the decommissioning process. See, e.g., 10 C.F.R. §§ 50.75, 50.82, 51.53, 51.95; 18 C.F.R. § 35.32; U.S. NRC, "Decommissioning Nuclear Power Plants," *supra*. Anyone can complain to the commission about such fraud or waste, including ComEd customers.

At the oral argument the plaintiffs' lawyer made the wild and unsubstantiated claim that the NRC cares only about safety and not at all about money (contrary to the regulations we've cited), that the cost of decommissioning Zion will be only $450 million, and that the Commission will simply ignore ZionSolutions' pocketing of $250 million ($700 million, the original trust money, minus $450 million) that of

rights belong to ComEd's customers. But not only is the Nuclear Regulatory Commission the designated policeman of decommissioners; its competence to assess the management of the complex, technologically sophisticated process of nuclear decommissioning exceeds that of state or federal judges, who are generalists. Rulings on decommissioning, including rulings on the financial issues involved in decommissioning, are within the commission's primary jurisdiction. As explained in *United States v. Western Pacific R.R.*, 352 U.S. 59, 63–64 (1956), "the doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. … 'Primary jurisdiction' … applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." That description of the doctrine fits this case to a T. See also *Illinois Bell Telephone Co. v. Global NAPs Illinois, Inc.*, 551 F.3d 587, 594–96 (7th Cir. 2008).

As for the option commonly exercised in primary-jurisdiction cases of "suspending" litigation pending reference to the expert agency, *Western Pacific* makes clear that a prerequisite to merely suspending, rather than dismissing, the suit is that the plaintiff's claim have been "originally cognizable in the courts." 352 U.S. at 63–64. Our plaintiffs, having sued only companies against which they have no rights, have failed to present a judicially cognizable claim.

The litigation must be, not suspended, but dismissed, as the district court ruled.

AFFIRMED.